**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | | |
|---|---|---|
| River Runners for Wilderness, et al., | ) | No. CV-06-894-PCT-DGC |
| Plaintiffs, | ) | **ORDER** |
| vs. | ) | |
| Stephen P. Martin, et al., | ) | |
| Defendants, | ) | |
| Grand Canyon River Outfitters, Association; and Grand Canyon Private Boaters Association, | ) | |
| Defendant-Intervenors. | ) | |

This case concerns the National Parks Service's decision to permit the continued use of motorized rafts and support equipment in Grand Canyon National Park. Plaintiffs contend that such motorized activities impair the wilderness character of the Canyon and that the Park Service's decision violates its management policies and various federal statutes. Plaintiffs ask the Court to set aside the decision under the Administrative Procedures Act ("APA"). For reasons explained in this order, Plaintiffs have not satisfied the high threshold required to set aside federal agency actions under the APA.

**I.    Background.**

Grand Canyon National Park ("Park") was established by Congress in 1919 and expanded in 1975. The Park consists of more than 1.2 million acres located on the southern end of the Colorado Plateau in Arizona.

The Park includes a 277-mile stretch of the Colorado River referred to in this order as the "Colorado River Corridor" or the "Corridor." The Park Service regulates the Colorado River Corridor through a periodically-revised Colorado River Management Plan ("CRMP"). In November of 2005, the Park Service issued a Final Environmental Impact Statement ("FEIS") for the 2006 CRMP. On February 17, 2006, the Park Service issued a Record of Decision ("ROD") that adopted and approved the 2006 CRMP. The 2006 CRMP permits the continued use of motorized rafts, generators, and helicopters in the Colorado River Corridor.

Plaintiffs River Runners for Wilderness, Rock the Earth, Wilderness Watch, and Living Rivers constitute "a coalition of organizations committed to protecting and restoring the Grand Canyon's wilderness character and unique natural resources and ensuring fair and equitable access to such resources[.]" Dkt. #1 at 3. Plaintiffs filed this action against the Park Service and various individual Defendants.[1] The Court subsequently permitted two private organizations to intervene in the action – Grand Canyon River Outfitters Association ("GCROA"), which consists of commercial operators of motorized and non-motorized rafts in the Colorado River Corridor, and Grand Canyon Private Boaters Association ("GCPBA"), which consists of private rafters and kayakers of the Corridor (collectively, "Intervenors").

Following exchanges of information and compilation of the administrative record, Plaintiffs, Defendants, and Intervenors all filed motions for summary judgment. Dkt. ##55, 62, 64, and 67. The Court held oral argument on October, 26, 2007.

### A.    Park Service Management of the Colorado River Corridor.

The waters of the Colorado River originate in the mountains of Colorado, Wyoming, and Utah and run 1,450 miles to the Gulf of California. The Colorado is the longest and largest river in the Southwestern United States. Once in the Grand Canyon, the river flows

---

[1] The named individual Defendants include Joseph F. Alston, superintendent of the Park; Fran Mainella, director of the Park Service; Gale Norton, Secretary of the United States Department of the Interior; the Department of the Interior; Paul K. Charlton, former United States Attorney for Arizona; and Alberto R. Gonzales, former Attorney General.

some 4,000 to 6,000 feet below the rim of the Canyon through cliffs, spires, pyramids, and successive escarpments of colored stone.  Access to the bottom of the Grand Canyon can be gained only by hiking, riding mules, or floating the river.  Those floating the river typically do so in motor-powered rubber rafts, oar- or paddle-powered rubber rafts, oar-powered dories, or kayaks.  Floating the river through the Grand Canyon is considered one of America's great outdoor adventures and includes some of the largest white-water rapids in the United States.[2]

Use of the Colorado River Corridor increased substantially after Glen Canyon Dam was completed in 1963 and produced a relatively steady flow through the Canyon.  Because of this increased use, the Park Service initiated a series of river planning and management efforts, culminating in a December 1972 River Use Plan.  SAR 000712.[3]  The plan concluded that "motorized craft should be phased-out of use in the Grand Canyon."  SAR 000721, 000705.  The plan also concluded that 89,000 commercial user days and 7,600 non-commercial user days would be allocated for the 1973 season (SAR 000706, 000707), but that commercial use would be scaled down to 55,000 user days by 1977 (SAR 000705).[4]  A 1973 Draft Environmental Impact Statement concluded that "[t]he use of motors . . . should be eliminated as soon as possible from the river environment" and that "[t]he propose[d] elimination of motorized trips will . . . hav[e] a positive environmental impact."  SAR 000917, 000929.

---

[2] When recently asked to identify the "adventure trip of a lifetime," more readers of Outside magazine chose rafting the Grand Canyon than any other adventure.  *See* Thanks for Sharing, Outside, Nov. 2007 at 124.

[3] "AR" refers to the Administrative Record (Dkt. #41) and "SAR" to the Supplemental Administrative Record (Dkt. #42).  The Court will cite to Bates numbers to identify pages.

[4] "A 'user day' is calculated by multiplying the number of passengers by the number of days. (A 'day' is defined as any portion of a 24-hour day.)  For example, if the [permit] holder has two clients on a two day trip, this would equal four user days."  National Parks Service, How a Commercial Use Authorization Works, https://cms.imr.nps.gov/bibe/parkmgmt/cua -operations.htm (last updated June 9, 2007).

1    The Park Service initiated a Colorado River Research Program in 1974 to examine,

2 among other things, the impact of motorized activities on the river.  SAR 003717, 003721.

3 In September of 1977, the Park Service issued a document suggesting that "the use of motors

4 is contrary to established health and safety standards" and again opining that the "use of

5 motorized craft should be eliminated."  SAR 003728.  The document noted that "[n]on-

6 motorized travel is more compatible with wilderness experience" and that "[m]otor noise

7 levels may have adverse effects on pilot performance, resulting in potential safety hazards."

8 SAR 003749.  The Park Service was unable, however, "to document [any] difference in

9 numbers and degree of injuries between the two types of craft."  *Id.*

10    In August of 1976, the Park Service issued a Master Plan for management of the Park.

11 The Master Plan included an objective of  "[l]imit[ing] mechanized access below the rims

12 [of the Grand Canyon] to emergency and management use."  SAR 002352.  In February of

13 1977, the Park Service recommended that Congress designate over one million acres within

14 the Park as wilderness.  SAR 002680.  The Park Service found that motorized use of the river

15 "is inconsistent with the wilderness criteria of providing outstanding opportunities for

16 solitude and for primitive and unconfined type of recreation."  SAR 002711, 002723.

17    The Park Service released the first CRMP in December of 1979.  SAR 005223-

18 005285.  Use of motorized watercraft between Lees Ferry and Separation Canyon was to be

19 phased out over a five-year period.  SAR 005244.  The 1979 CRMP stated that such a phase-

20 out was consistent with "the objective of the [1976] Master Plan[,] corresponded with the

21 park wilderness proposal," and was "based on the extensive Colorado River Research project

22 for the Grand Canyon[.]"  *Id.*  The CRMP increased the allocated commercial user days from

23 89,000 per year to 115,500 and increased the allocated non-commercial user days from 7,600

24 to 54,450.  SAR 005246.  In September 1980, the Park Service proposed that the Colorado

25 River Corridor be designated as "potential wilderness" and, once motorboat use was phased-

26 out, as "wilderness."  SR 005770.

27    Congress countermanded the 1979 CRMP in a 1981 appropriations bill for the

28 Department of the Interior.  The bill prohibited the use of appropriated funds "for the

1   implementation of any management plan for the Colorado River within the [Park] which

2   reduces the number of user days or passenger-launches for commercial motorized watercraft

3   excursions[.]"  SAR 005896.  Members of Congress sent a letter to the Park Service

4   expressing their "wish that the [1979 CRMP] be amended . . . to accommodate the 1978 level

5   and pattern of commercial, motorized watercraft access while at the same time protecting . . .

6   the increased non-commercial allocation which the plan provides."  SAR 005901.  The Park

7   Service subsequently revised the 1979 CRMP to "retain[] motorized use and the increase in

8   user-days that had been intended as compensation for the phase-out of motors, resulting in

9   more motorized use of the river."  AR 104602.

10          The Park Service issued a second CRMP in 1989.  The 1989 CRMP was similar to

11  the revised 1979 CRMP.  It included the same allocation of user days for commercial and

12  non-commercial boaters, but increased the number of non-commercial launches. AR 000863.

13          The Park Service's 1995 General Management Plan ("GMP") for the Park identified

14  an objective of "provid[ing] a wilderness river experience on the Colorado River," but

15  explained that "this objective will not affect decisions regarding the use of motorboats on the

16  river."  SAR 010142.  Rather, the GMP stated that the 1989 CRMP would be revised and that

17  the revised plan would address the use of motors.  SAR 010188.

18          **B.     The 2006 CRMP.**

19          Planning for the 2006 CRMP began in 1997 with the solicitation of public comments

20  and a series of public workshops in Oregon, Utah, and Arizona.  After this process was

21  suspended and restarted following the filing of two lawsuits, the Park Service published in

22  the Federal Register, on June 13, 2002, a notice of intent to prepare an environmental impact

23  statement for a revised CRMP.  Seven additional public meetings and stakeholder workshops

24  were held in Colorado, Utah, Arizona, Nevada, Maryland, and California.  More than one

25  thousand people attended the meetings and the Park Service received more than 13,000

26  written submissions.

27          In the Fall of 2004, the Park Service released for public review a Draft Environmental

28  Impact Statement ("DEIS") for the revised CRMP.  The DEIS presented eight alternatives

1    (Alternatives A-H) for managing the river from Lees Ferry to Diamond Creek, a stretch of

2    226 miles referred to in this order as the "Lees Ferry Segment," and five alternatives

3    (Alternatives 1-5) for managing the river from Diamond Creek to Lake Mead, a stretch of

4    51 miles referred to in this order as the "Lower Gorge." The alternatives included motorized

5    and non-motorized options. Because of the complexity of the DEIS and the level of public

6    interest, the Park Service extended the standard 90-day comment period for one additional

7    month. The Park Service also hosted public meetings in Colorado, Utah, Washington, D.C.,

8    Nevada, Arizona, and California. The Park Service received some 10,000 written

9    submissions, including approximately 6,000 substantive and 30,000 non-substantive

10   comments on the DEIS. The Park Service coded, organized, analyzed, and responded to the

11   substantive comments, and modified the DEIS where it felt modifications were warranted.

12       The Park Service received comments from a coalition of groups representing both

13   commercial and non-commercial boaters of the Colorado River Corridor – groups often at

14   odds with each other on issues of river management. The coalition included Intervenors,

15   American Whitewater, and Grand Canyon River Runners Association. The coalition

16   supported equal allocation of river time between commercial and non-commercial boaters

17   and the continued authorization of appropriate levels of motorized use. AR 060444-51.

18       In November 2005, the Park Service issued the three-volume Final Environmental

19   Impact Statement. The FEIS addressed the same alternatives discussed in the DEIS, with

20   some modifications to Alternatives H and 4, and expressed a preference for Modified

21   Alternative H for the Lees Ferry Segment and Modified Alternative 4 for the Lower Gorge.

22   The selected alternatives permitted the use of motorized rafts, generators for emergencies and

23   inflating rafts, and helicopters to make passenger exchanges at the Whitmore helipad. As

24   noted above, in February 2006, the Park Service issued a ROD  that formally adopted

25   Modified Alternatives H and 4 for the 2006 CRMP.

26   **II.    The Court's Task.**

27       Plaintiffs argue that the 2006 CRMP is unlawful and should be set aside. The Court's

28   task is not to make its own judgment about whether motorized rafts should be allowed in the

Colorado River Corridor. Congress has delegated that responsibility to the Park Service. The Court's responsibility is narrower: to determine whether the Park Service's 2006 CRMP comports with the requirements of the APA, 5 U.S.C. § 701 *et seq.*

The APA does not allow the Court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts. *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 555 (1978) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)). An agency's decision may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The standard is deferential. The Court "may not substitute its judgment for that of the agency concerning the wisdom or prudence of [the agency's] action." *Or. Envtl. Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1987).

In conducting an APA review, the Court must determine whether the agency's decision is "founded on a rational connection between the facts found and the choices made . . . and whether [the agency] has committed a clear error of judgment." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1243 (9th Cir. 2001). "The [agency's] action . . . need only be a reasonable, not the best or most reasonable, decision." *Nat'l Wildlife Fed. v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989).

Plaintiffs assert that the 2006 CRMP is arbitrary and capricious under the APA because it violates the Park Service's own policies, the National Park Service Concessions Management and Improvement Act ("Concessions Act"), the National Park Service Organic Act ("Organic Act"), and the National Environmental Policy Act ("NEPA"). The Court will address each of these arguments separately.

**III.    Compliance with Park Service Policies.**

**A.    Enforceability of the Policies.**

Even though Congress has never acted on the Park Service's recommendation to designate a substantial portion of the Park as wilderness, Plaintiffs claim that the Park Service's own policies give rise to a legally binding obligation to maintain the wilderness character of the Park. Plaintiffs claim that the Park Service has breached this legal duty by

authorizing the continued use of motorized activities in the 2006 CRMP.  Defendants and
Intervenors argue that the Park Service policies do not have the force and effect of law and
therefore may not be enforced against the Park Service in this legal action.

In their motion for summary judgment, Plaintiffs identified three policies that
allegedly create binding obligations on the Park Service:  the 1976 Master Plan, the 1995
GMP, and the 2001 Park Service Management Policies (the "2001 Policies").  Two of these
arguments – the 1976 Master Plan and the 1995 GMP – are easily eliminated.  Plaintiffs
conceded at oral argument that the 1976 Master Plan has been superseded and cannot be
viewed as binding; and Plaintiffs devoted little time at argument or in their reply brief to their
claim that the 1995 GMP creates legal obligations.  The Court concludes that is does not.[5]
Plaintiffs instead focus on the 2001 Policies, arguing that they are binding because they are
written in mandatory language, were mentioned in the Federal Register, and have been found
binding in *Southern Utah Wilderness Alliance v. National Park Service*, 387 F. Supp. 2d
1178 (D. Utah 2005) ("*SUWA*").  The Court will address this argument in some detail.

In *United States v. Fifty-Three (53) Eclectus Parrots*, 685 F.2d 1131 (9th Cir. 1982),
the Ninth Circuit established a two-part test for determining when agency pronouncements
have the force and effect of law:

> To have the force and effect of law, enforceable against an agency in federal
> court, the agency pronouncement must (1) prescribe substantive rules – not
> interpretive rules, general statements of policy or rules of agency organization,
> procedure or practice – and (2) conform to certain procedural requirements.
> To satisfy the first requirement the rule must be legislative in nature, affecting
> individual rights and obligations; to satisfy the second, it must have been
> promulgated pursuant to a specific statutory grant of authority and in
> conformance with the procedural requirements imposed by Congress.

*Id.* at 1136 (internal quotes and citations omitted).

---

[5]The text of the 1995 GMP states that it "*guides* the management of resources, visitor use,
and general development of the [P]ark over a 10- to 15-year period." SAR 010132 (emphasis
added).  The GMP sets out "objectives" and "visions" for management of the Park.  SAR
010138.  The GMP was not published in the Federal Register or the Code of Federal
Regulations.  For reasons explained below with respect to the 2001 Policies, such general
policy guidance does not have the force and effect of law.

1    The 2001 Policies fail the first part of the *Eclectus Parrots* test because they do not

2    purport to prescribe substantive rules.  As the United States Court of Appeals for the District

3    of Columbia Circuit recently held with respect to these very Policies:  "While the text of the

4    Policies on occasion uses mandatory language, such as 'will' and 'must,' the document as

5    a whole does not read as a set of rules.  It lacks precision in its directives, and there is no

6    indication of how the enumerated policies are to be prioritized."  *The Wilderness Soc'y v.*

7    *Norton*, 434 F.3d 584, 595 (D.C. Cir. 2006).

8    The text of the 2001 Policies makes clear that they are intended only to provide

9    guidance within the Park Service, not to establish rights in the public generally.  The

10   Introduction describes the Policies as a "basic Service-wide policy document," as a

11   "guidance document[]," and as a statement of policy "designed to provide [Park Service]

12   management and staff with clear and continuously updated information . . . that will help

13   them manage parks and programs effectively."  SAR 016079.  That the 2001 Policies are not

14   intended to have the same force as binding Park Service regulations is made clear by the

15   Introduction's explanation that existing, formally-promulgated Park Service regulations will

16   trump inconsistent provisions in the 2001 Policies until such time as the regulations "are

17   formally revised through the rulemaking procedure[.]"  SAR 016082.

18   Equally significant, the Introduction to the 2001 Policies provides that Park Service

19   management can choose to waive or modify the Policies:  "Adherence to policy is mandatory

20   unless specifically waived or modified in writing by the Secretary, the Assistant Secretary,

21   or the Director."  SAR 016078.  "Waivers and modifications will be considered on a case-by-

22   case basis," the Policies explain.  SAR 016079.  Needless to say, policy statements that may

23   be waived or modified by an agency can hardly be said to have the binding force of law.  As

24   the D.C. Circuit noted, "this language does not evidence an intent on the part of the agency

25   to limit its discretion and create enforceable rights.  Rather, the agency's top administrators

26   clearly reserved for themselves unlimited discretion to order and reorder all management

27   priorities."  *Wilderness Soc'y*, 434 F.3d at 596.

28   Nor do the 2001 Policies purport to create substantive individual rights or obligations

for persons or entities outside the Park Service. The Policies set forth priorities, practices, and procedures to be followed by Park Service personnel in administering the national park system. In the words of *Eclectus Parrots*, they are "interpretive rules, general statements of policy or rules of agency organization, procedure or practice[.]" 685 F.2d at 1136 (quotes and citations omitted). *See also United States v. Alameda Gateway Ltd.*, 213 F.3d 1161, 1168 (9th Cir. 2000) (agency rule did not have the force or effect of law in part because "[i]t was not intended to create substantive rights in third parties"); *Moore v. Apfel*, 216 F.3d 864, 868-69 (9th Cir. 2000) (agency provision did not satisfy the *Eclectus Parrots* test, as it "creates no substantive rights" and instead "provides [agency] staff with internal procedures"); *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979) (whether an agency pronouncement affects individual rights and obligations "is an important touchstone for distinguishing those rules that may be binding or have the force of law") (internal quotation marks and citation omitted).

The 2001 Policies also fail the second part of the *Eclectus Parrots* test. The APA requires that "publication or service of a substantive rule shall be made not less than 30 days before its effective date." 5 U.S.C. § 553(d). The 2001 Policies were not published in the Federal Register. The Park Service did publish a notice of the availability of a draft of the 2001 Policies and a notice of new policy, but never published the 2001 Policies themselves. *See* 65 Fed. Reg. 2984 (Jan. 19, 2000); 65 Fed. Reg. 56003 (Sept. 15, 2000). What is more important, the Policies were never published in the Code of Federal Regulations. This suggests that the Park Service did not intend to announce substantive rules enforceable by third parties in federal court. *See W. Radio Servs. Co., Inc. v. Espy*, 79 F.3d 896, 901 (9th Cir. 1996) (stating, in its determination that two agency documents did not satisfy the *Eclectus Parrots* test, that "[n]either [document] is published in the Federal Register or the Code of Federal Regulations"). The D.C. Circuit found this lack of publication "particularly noteworthy" in concluding that the 2001 Policies are not substantive law. *Wilderness Soc'y*, 434 F.3d at 595; *see also Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 539 (D.C. Cir. 1986) ("The real dividing point between regulations and general statements of policy is

1   publication in the Code of Federal Regulations[.]").

2        This conclusion is bolstered by the Park Service's own characterization of the 2001

3   Policies.  In its Federal Register announcement that a draft of the 2001 Policies was available

4   for public comment, the Park Service explained that "park superintendents, planners, and

5   other [Park Service] employees use management policies as a reference source when making

6   decisions that will affect units of the national park system."  65 Fed. Reg. 2984 (Jan. 19,

7   2000).  A "reference source," of course, is not the same as binding substantive law.

8        In sum, the 2001 Policies are not enforceable against the Park Service in this action.

9   The Policies do not prescribe substantive rules, nor were they promulgated in conformance

10  with the procedures of the APA.  *Eclectus Parrots*, 685 F.2d at 1136.  The Court therefore

11  may not set aside the 2006 CRMP because it fails to comply with portions of the 2001

12  Policies requiring the Park Service to treat the Colorado River Corridor as wilderness or

13  potential wilderness, nor may the Court conclude, as Plaintiffs argue, that provisions of the

14  Wilderness Act are incorporated into the 2001 Policies and binding on the Park Service in

15  this case.[6]

16       **B.   Plaintiffs' *Chevron* Cases.**

17       Plaintiffs argue that the lack of formal rulemaking does not prevent the 2001 Policies

18  from having the force and effect of law.  For support, Plaintiffs rely primarily on *United*

19  *States v. Mead Corp.*, 533 U.S. 218 (2001), and *SUWA*, 387 F.Supp.2d 1178.  Plaintiffs in

20  *Mead* challenged a tariff ruling by the United States Customs Service.  Plaintiffs in *SUWA*

21  challenged a decision by the Park Service to ban motorized vehicles in a portion of

22

23  [6] Much of Plaintiffs' argument rests on the Wilderness Act, 16 U.S.C. §§ 1131-1136.
24  Plaintiffs argue, for example, that motorized uses are prohibited by the Act, motorized rafting
    in the Colorado River Corridor is not "established" under the Act, and such rafting is not
25  "necessary and proper" as required by the Act.  These arguments are unavailing, however,
    because the portions of the Act cited by Plaintiffs apply only to designated wilderness and
26  the Park has never been designated as wilderness by Congress.  In addition, as noted above,
27  the 2001 Policies are not binding law that incorporates the Wilderness Act.  Indeed, Plaintiffs
    admit in their reply memorandum that they are not making a claim under the Wilderness Act.
28  *See* Dkt. #71 at 4.

Canyonlands National Park.  In both cases the courts were required to decide whether the agency decisions were entitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

The Supreme Court explained *Chevron* deference in this manner:  when Congress has expressed an expectation that an agency will speak with the force of law and resolve ambiguities or fill gaps in statutory law, "a reviewing court has no business rejecting an agency's exercise of its generally conferred authority . . . simply because the agency's chosen resolution seems unwise, but is obligated to accept the agency's position if Congress has not previously spoken to the point at issue and the agency's interpretation is reasonable[.]" *Mead*, 533 U.S. at 229 (citations omitted).  In short, Courts are not to interfere with reasonable agency decisions rendered within areas where Congress has authorized the agencies to act.

Among other considerations, a court applying the *Chevron* doctrine asks whether an agency decision is intended by Congress to have the force of law.  The Supreme Court noted in *Mead* that the existence of formal notice-and-comment rulemaking is a strong indicator of such authority.  The Supreme Court went on to explain, however, that "as significant as notice-and-comment rulemaking is in pointing to *Chevron* authority, the want of that procedure here does not decide the case, for we have sometimes found reasons for *Chevron* deference even when no such administrative formality was required and none was afforded[.]"  *Id.* at 230-31.  The District Court in *SUWA* relied on this language and found that *Chevron* deference was due the Park Service's decision to ban motorized vehicles in Canyonlands even though the decision was based on the 2001 Policies that were not adopted through formal notice-and-comment rulemaking.  387 F. Supp. 2d at 1187-88.  Plaintiffs rely on this holding and the above-quoted language from *Mead* to argue that the same 2001 Policies should have the force and effect of law in this case.

There is a difference, however, between application of the *Chevron* doctrine in *SUWA* and the question to be decided in this case.  The plaintiffs in *SUWA* argued that the 2001 Policies were not entitled to deference and that a decision based on them should be set aside.

The District Court relied on the *Chevron* doctrine to conclude that the 2001 Policies provided a sound basis for deference to the Park Service – a shield for the agency's decision concerning the proper administration of Canyonlands National Park. Plaintiffs in this case seek an opposite result – to use the same 2001 Policies as a sword to set aside Park Service decisions concerning the proper administration of Grand Canyon National Park.

*Chevron* analysis does not control this case. Whether an agency's decision falls within the scope of activity intended by Congress to resolve ambiguities or fill gaps in the governing statutes and therefore is entitled to deference in the courts is a different question than whether an agency's decision becomes binding law that gives outside parties the right to enforce the decision against the agency in court. The first question asks whether the agency has acted within the realm and with the expertise Congress intended. The second focuses on the substance and form of the agency's action and asks whether the agency intended to promulgate binding law for itself and the outside world. This case presents the second question – a question to be decided under *Eclectus Parrots*. As explained above, the 2001 Policies are not enforceable against the Park Service under *Eclectus Parrots*.[7]

**C.    The Policies Do Not Render the 2006 CRMP Arbitrary and Capricious.**

Citing *Ecology Center, Inc. v. Austin*, 430 F.3d 1057 (9th Cir. 2005), and related cases, Plaintiffs alternatively argue that the 2006 CRMP is arbitrary and capricious even if the 2001 Policies do not have the force and effect of law. The Ninth Circuit held in *Ecology Center* that the Forest Service could not disregard a non-binding soil standard when the Forest Service's own environmental impact statement purported to comply with the standard. To disregard the standard, the court held, would render the environmental impact statement misleading and unlawful. *Id.* at 1069. Plaintiffs argue that because the FEIS and ROD

---

[7]The Court recognizes that the decision in *SUWA* contains language at odds with this order. *SUWA* concludes, for example, that the 2001 Policies "are not a general statement of policy, but prescribe substantive rules." 387 F.Supp.2d at 1189. The Court views the *Chevron* context of these statements as a sufficient basis to distinguish them from this case, but to the extent they are simply inconsistent with this order, the Court respectfully disagrees with them for the reasons explained in part III.A above.

1   purport to follow the 2001 Policies and the 1995 GMP, but in fact fail to do so, they are

2   arbitrary and capricious.  The Court does not agree.

3          Plaintiffs base their argument on the fact that the Colorado River Corridor has been

4   classified by the Park Service as potential wilderness.  The 2001 Policies provide the

5   following guidance with respect to the management of potential wilderness areas:

6          The National Park Service will take no action that would diminish the
       wilderness suitability of an area possessing wilderness characteristics until the
7       legislative process of wilderness designation has been completed. . . . This
       policy also applies to potential wilderness, requiring it to be managed as
8       wilderness to the extent that existing non-conforming conditions allow. The
       National Park Service will seek to remove from potential wilderness the
9       temporary, non-conforming conditions that preclude wilderness designation.

10  2001 Policies § 6.3.1 (SAR 016136-37).  The FEIS makes this same commitment with

11  respect to the Colorado River Corridor.  *See* FEIS Vol. I at 234.

12         The language of § 6.3.1 makes clear that the Park Service is required to manage

13  potential wilderness areas as actual wilderness only "to the extent that existing non-

14  conforming conditions allow."  This language does not require the Park Service immediately

15  to remove existing non-conforming uses – in this case, motorized rafts.  It requires the Park

16  Service to manage the Colorado River Corridor as wilderness to the extent possible given the

17  existing use of motors.  In light of this clear provision, the Court cannot conclude that the

18  2006 CRMP is arbitrary and capricious for failing to remove motorized uses in the Colorado

19  River Corridor immediately.[8]

20         Section 6.3.1 further states that the Park Service "will seek to remove from potential

21  wilderness the temporary, non-conforming conditions that preclude wilderness designation."

22  2001 Policies § 6.3.1 (SAR 016137).  Seasonal uses of motors on the river do not preclude

23  wilderness designation.  Plaintiffs do not contend that such uses work any permanent change

24  on the Corridor that would preclude later wilderness treatment.  Seasonal float trips are not

25

26  [8]Nor did Plaintiffs appear to believe that immediate removal was required when they
27  submitted written comments on the DEIS.  Plaintiffs did not assert that the 2001 Policies
    required the immediate removal of motorized uses, but instead endorsed a plan to "phas[e]
28  out motorized use over a reasonable time period not to exceed 10 years."  AR 050222.

- 14 -

like the construction of a road or other physical improvements that might disqualify an area for wilderness designation in the future. Motorized float trips can readily be eliminated if Congress decides that the Corridor should be designated as wilderness. The FEIS concludes that the use of motors in the Corridor "is only a temporary or transient disturbance of wilderness values" and "does not permanently impact wilderness resources or permanently denigrate wilderness values." FEIS, Vol. I at 17; *see also* AR 093108-19 (discussion of limited effect of motorized uses on soils), AR 093051 (same for water quality), AR 093083-84 (same for air quality), AR 093132-33 (same for natural soundscape).[9]

Plaintiffs also argue that the 2006 CRMP is arbitrary and capricious in light of the 1995 GMP, citing portions of the GMP that require the Park Service to "protect the natural quiet and solitude" of the Park and "manage areas meeting criteria for wilderness designation as wilderness." SAR 010126. While the 1995 GMP does contain these general statements, it also contains specific exceptions for motorized rafting. The GMP's stated objective for management of the river reads as follows: "Provide a wilderness river experience on the Colorado River (this objective will not affect decisions regarding the use of motorboats on the river)." SAR 010142. Elsewhere, the 1995 GMP states that "[t]he use of motorboats will be addressed in the revised [CRMP], along with other river management issues identified through the scoping process." SAR 010188. Because the 1995 GMP expressly declines to require the elimination of motorized uses in the Corridor, and in fact defers a decision on such uses to the 2006 CRMP, it plainly does not render the 2006 CRMP's resolution of the issue arbitrary and capricious.[10]

---

[9]During oral argument, Plaintiffs asserted that § 6.4.3.3 of the 2001 Policies, which precludes motors in "wilderness" areas, trumps § 6.3.1. It appears to the Court, however, that § 6.3.1 is the more relevant provision because it applies specifically to areas "possessing wilderness characteristics" that have not yet been designated as wilderness by Congress – precisely the circumstance of the Colorado River Corridor.

[10]Plaintiffs argue that the 2006 CRMP should be set aside because motorized traffic on the river does not constitute an "established use" under section 4(d)(1) of the Wilderness Act, 16 U.S.C. § 1133(d)(1). As noted earlier, however, this is not a Wilderness Act case.

1    The Court notes, additionally, that federal agencies are entitled to some leeway when

2    interpreting their own policies and regulations.  *Stinson v. United States*, 508 U.S. 36, 45

3    (1993) ("provided an agency's interpretation of its own regulations does not violate the

4    Constitution or a federal statute, it must be given controlling weight unless it is plainly

5    erroneous or inconsistent with the regulation.").  When that leeway is added to the CRMP's

6    general consistency with the 2001 Policies and the 1995 GMP, the Court cannot conclude

7    that the policies, even if not enforceable in court, render the CRMP arbitrary and capricious.

8    Finally, Plaintiffs argue that the 2006 CRMP is arbitrary and capricious because it

9    contradicts earlier Park Service decisions to phase out motorized boating in the Colorado

10   River Corridor.  As noted above, the 1979 CRMP called for motorized watercraft between

11   Lees Ferry and Separation Canyon to be phased out over a five-year period.  SAR 005244.

12   The Court cannot conclude, however, that the 2006 CRMP is arbitrary and capricious solely

13   because it differs from earlier Park Service decisions.  Part of the discretion granted to

14   federal agencies is the freedom to change positions.  As the Supreme Court has explained,

15   "[a]n agency's view of what is in the public interest may change, either with or without a

16   change in circumstances.  But an agency changing its course must supply a reasoned

17   analysis."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 57

18   (1983) (quotation omitted).  The question posed by this lawsuit, therefore, is not whether the

19   2006 CRMP differs from past Park Service decisions, but whether it is arbitrary and

20   capricious in light of facts in the administrative record and the reasoning of the FEIS.  For

21   reasons explained in this order, the Court finds the 2006 CRMP sufficiently reasonable to

22   pass APA muster.

23   **IV.    The Concessions Act.**

24   Plaintiffs contend that the 2006 CRMP is arbitrary and capricious because it fails to

25   comply with the requirements of the Concessions Act.  The Act governs the granting of

26   commercial concessions within the National Park System.  "To make visits to national parks

27   more enjoyable for the public, Congress authorized [the Park Service] to grant privileges,

28   leases, and permits for the use of land for the accommodation of visitors.  Such privileges,

1  leases, and permits have become embodied in national parks concession contracts." *Nat'l*
2  *Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 805-806 (2003).  The specific
3  provision of the Act relied on by Plaintiffs articulates a Congressional "policy" for the
4  granting of concessions:

5          It is the policy of the Congress that the development of public
        accommodations, facilities, and services in units of the National Park System
6        shall be limited to those accommodations, facilities, and services that –

7          (1) are necessary and appropriate for public use and enjoyment of the
        unit of the National Park System in which they are located; and
8
          (2) are consistent to the highest practicable degree with the preservation
9        and conservation of the resources and values of the unit.

10  16 U.S.C. § 5951(b).

11      Plaintiffs claim that the 2006 CRMP is arbitrary and capricious because the Park
12  Service never determined that the types and levels of motorized uses authorized by the
13  CRMP are necessary and appropriate for public use and consistent with the Park's resources
14  and values.  Before addressing this argument, the Court must address the legal standard that
15  governs review of a Concessions Act claim.

16      **A.    Legal Standard Under the Concessions Act.**

17      In support of their Concessions Act argument, Plaintiffs rely heavily on *High Sierra*
18  *Hikers Ass'n v. Blackwell*, 390 F.3d 630 (9th Cir. 2004), a case in which the Ninth Circuit
19  struck down the Forest Service's grant of permits to commercial packstock operators in the
20  Ansel Adams and John Muir Wilderness Areas of California.  The Court held that the Forest
21  Service must make a finding that "the number of permits granted was no more than was
22  necessary to achieve the goals of the Act."  *Id.* at 647.  Plaintiffs argue that *Blackwell*
23  requires a similar Park Service finding for the number of motorized raft trips permitted in the
24  2006 CRMP.

25      It is significant, however, that the court in *Blackwell* was applying the Wilderness Act,
26  not the Concessions Act.  The Wilderness Act places strict limitations on the use of lands
27  formally designated by Congress as wilderness.  With narrow exceptions, the Wilderness Act
28  prohibits commercial enterprises, permanent roads, and motorized vehicles in wilderness

1    areas.  16 U.S.C. § 1133(c).  Federal agencies are obligated to manage such areas to preserve

2    their wilderness character.  *Id*. at § 1133(b).  The Ninth Circuit explained in *Blackwell* that

3    the Forest Service's obligation to limit commercial packstock permits "flows directly out of

4    the agency's obligation under the Wilderness Act to protect and preserve wilderness areas."

5    390 F.3d at 647.  It was this "ultimate interest" and "overarching purpose" of the Wilderness

6    Act – to protect the Ansel Adams and John Muir Wilderness Areas from degradation – that

7    led the Ninth Circuit to hold that the packstock permit decision violated "the Forest Service's

8    statutory responsibility."  *Id*. at 647-48.

9           This case, by contrast, does not concern a wilderness area.  Congress has never acted

10   on the Park Service's recommendation that portions of the Park be formally designated as

11   wilderness.  The Park Service, therefore, is not under the same "statutory responsibility" that

12   applied to the Forest Service in *Blackwell*.  The Court must look to the Concessions Act, not

13   the Wilderness Act, for the governing legal standard.

14          In *Wilderness Preservation Fund v. Kleppe*, 608 F.2d 1250 (9th Cir. 1972), the Ninth

15   Circuit decided a case under 16 U.S.C. § 20, the statutory predecessor to the Concessions

16   Act.  *See City of Sausalito v. O'Neill*, 386 F.3d 1198, 1204 (9th Cir. 2004) (*Kleppe* decided

17   under predecessor to Concessions Act); Pub. L. 105-391, 1123 Stat. 3515 (16 U.S.C. § 20

18   superceded by 16 U.S.C. § 5951).  The predecessor statute, like the Concessions Act, stated

19   a Congressional "policy" that commercial concessions in national parks should be "limited

20   to those that are necessary and appropriate for public use and enjoyment of the national park

21   area in which they are located."  *Kleppe*, 608 F.2d at 1253.  In rejecting a challenge under

22   this policy to the Park Service's allocation of rafting permits in the Colorado River Corridor,

23   *Kleppe* recognized the "administrative discretion" granted the Park Service and invoked "a

24   judicial presumption favoring the validity of administrative actions."  *Id*. at 1254.

25          This more deferential standard appears to be warranted.  The Park Service is charged

26   with administering almost 400 national parks.  *See* National Park Service, About Us,

27   http://www.nps.gov/aboutus/index.htm (last visited Nov. 20, 2007).  The Concessions Act

28   does not impose strict wilderness requirements on those parks, but instead articulates a policy

that calls for the Park Service to balance the interests of public use and resource preservation. 16 U.S.C. § 5951(b).  The Park Service's balancing of those interests over the broad range and diverse circumstances of hundreds of national parks is appropriately accorded the kind of deference recognized in *Kleppe*.  The Court concludes that the deferential approach of *Kleppe*, rather than the statutory application of the Wilderness Act in *Blackwell*, should govern this case.[11]

### B.     The 2006 CRMP and the Concessions Act.

Plaintiffs first contend that the Park Service failed entirely to determine that the types and levels of commercial services authorized by the 2006 CRMP are necessary and appropriate.  The Court disagrees.  The Park Service made the following determinations:

> Since many visitors who wish to raft on the Colorado River through Grand Canyon possess neither the equipment nor the skill to successfully navigate the rapids and other hazards of the river, the [Park Service] has determined that it is necessary and appropriate for the public use and enjoyment of the park to provide for experienced and professional river guides who can provide such skills and equipment.
>
> ***
>
> [S]ervices provided by commercial outfitters, which enable thousands of people to experience the river in a relatively primitive and unconfined manner and setting (when many of them otherwise would be unable to do so), are necessary to realize the recreational or other wilderness purposes of the park.

FEIS Vol. I at 19.

Plaintiffs argue that although the Park Service may have found commercial outfitters to be necessary and appropriate generally, it never made such a finding for *motorized* commercial services.  Again the Court disagrees.  The ROD specifically states that "[d]etermination of the *types and levels* of commercial services that are necessary and

---

[11]Defendants themselves state that the "necessary and appropriate" standard of the Concessions Act is "analogous" to the "necessary and proper" standard in the Wilderness Act. Dkt. #69 at 25. Defendants make this statement, however, in the context of arguing that the 2006 CRMP survives a challenge under the Concessions Act for the same reasons it would survive a challenge under the Wilderness Act if that Act applied. *Id*. at 25-26. The Court does not take this statement as a concession that the legal requirements of the two acts are the same. For the reasons explained above, the Court finds that the two Acts are appropriately treated differently in *Blackwell* and *Kleppe*.

1   appropriate for the Colorado River through Grand Canyon National Park were determined

2   through [the FEIS]."   ROD at 6 (AR 109596) (emphasis added).   Among the eight

3   management alternatives considered by the Park Service in the DEIS and FEIS were two that

4   did not authorize any motorized uses in the Colorado River Corridor (Alternatives B and C).

5   After evaluating these alternatives, the Park Service found that they "violated the basic

6   premise of this planning effort; that of reducing congestion, crowding and impacts without

7   reducing access of visitors to the Colorado River[.]" FEIS Vol. III at 373. "As demonstrated

8   by the Park Service's analysis of the no-motor alternatives, a decision by the Park Service

9   to eliminate the motorized trip option would cause a dramatic reduction in the public

10  availability of professionally outfitted river trips[.]" *Id.* at 87.  The Park Service explained

11  that "continued authorization of motorized use for recreational river trips in the [Park] is

12  essential . . . to meeting the . . . management objectives" for the 2006 CRMP. *Id.*  Thus, the

13  Park Service quite clearly concluded that motorized commercial services were "necessary

14  and appropriate for public use and enjoyment" of the Corridor.  16 U.S.C. § 5951(b).[12]

15         Plaintiffs contend that even if the Park Service found that motorized services were

16  necessary and appropriate, it made no determination as to the *amount* of such services that

17  are necessary, and therefore failed to "limit" motorized uses to those that are necessary and

18  appropriate as required by the Congressional policy statement of the Concessions Act.  It is

19  true that the FEIS and ROD do not contain a specific discussion of the amount of motorized

20  traffic found necessary and appropriate for public use and enjoyment of the Corridor.  But

21  the absence of such a specific discussion does not necessarily require the agency's action to

22  be overturned.  "While [a court] may not supply a reasoned basis for the agency's action that

23

24  [12]In *Blackwell*, the Ninth Circuit stated that an agency's finding of necessity "requires this
    court to defer to the agency's decision under the broad terms of the [Wilderness] Act."  390
25  F.3d at 647.  It was only when the Forest Service's decision ran afoul of the "overarching
    purpose" of the Wilderness Act – wilderness preservation – that it was struck down.  *Id.* at
26  648.  If an agency's finding of permit necessity under the Wilderness Act is entitled to
27  deference, *a fortiori* it is entitled to deference under the less demanding requirements of the
28  Concessions Act.

1   the agency itself has not given, [the court] will uphold a decision of less than ideal clarity if

2   the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best*

3   *Freight Sys., Inc.*, 419 U.S. 281, 285 (1974) (citations omitted).  The Park Service's

4   consideration of the amount of motorized traffic required in the Colorado River Corridor can

5   reasonably be discerned from the FEIS.

6        The 1989 CRMP established use levels that were still in effect when the 2006 CRMP

7   planning process began.  Among the alternatives considered in the DEIS and FEIS was a

8   "no-action alternative" – an alternative that would have left the 1989 levels in place.  This

9   alternative, designated in the FEIS as Alternative A, would continue to allocate 113,083 user

10  days to commercial operators (74,260 motorized and 38,823 non-motorized) and 58,048 user

11  days to non-commercial users.  FEIS Vol. I at 45.  Alternative B would have eliminated all

12  motorized traffic on the river and allocated 97,694 user days to commercial operators and

13  74,523 to non-commercial.  *Id*. at 47.  Alternative C also would have eliminated all

14  motorized trips, but would have increased commercial user days to 166,814 and non-

15  commercial to 115,783, presumably to accommodate sufficient numbers of visitors with the

16  slower non-motorized trips.  *Id*. at 49.  Alternatives D, E, F, and G would have permitted

17  motorized uses, but varied the amounts for commercial and non-commercial traffic.  *Id*. at

18  51-57.  The levels of motorized user days for Alternatives D, E, F, and G would have been

19  70,104, 76,913, 83,076, and 76,913, respectively.  *Id*.

20       User days were not the only variables evaluated by the Park Service.  The FEIS also

21  considered months without motors on the river, trip lengths, trip lengths during various parts

22  of the year, group sizes, numbers of launches, numbers of passengers, and helicopter

23  exchanges at the Whitmore helipad.  *Id*. at 61.  The Park Service evaluated these alternatives

24  against environmental, social, and park-management factors including impacts on soils,

25  water, air, soundscape, caves, vegetation, terrestrial life, aquatic resources, special status

26  species, cultural resources, visitor experience, socio-economic resources, park management

27  and operations, adjacent lands, and wilderness character.  *Id*. at 61-65.

28       The Park Service ultimately concluded that Alternatives B and C – the non-motor

alternatives – would not meet the agency's objective of providing "a diverse range of quality recreational opportunities for visitors to experience and understand the environmental interrelationships, resources, and values of Grand Canyon National Park" because of the significantly reduced number of visitors who could experience the Colorado River Corridor. *Id*. at 71; *see* FEIS Vol. II at 626-27, 630-31.  The Park Service evaluated a range of motorized use times in the other alternatives and, after considering all factors and variables, selected Modified Alternative H.  That Alternative included specific allocations for motorized and non-motorized uses:  a total of 115,500 commercial user days consisting of 76,913 motorized and 38,587 non-motorized, and an estimated 113,486 non-commercial user days.  FEIS Vol. I at 60.

Modified Alternative H reduced the amount of motorized traffic in the Colorado River Corridor and the months within which it can occur, while significantly increasing the traffic for non-commercial uses.  The time period during which it prohibited motorized uses in the Corridor each year is September 16 through March 31 – 3.5 months longer than under the 1989 CRMP. FEIS Vol. I at 61. Modified Alternative H also reduced motorized commercial launches from 473 per year to 429 per year, and total motorized passengers from 14,487 to 13,177.  *Id*. at 45, 60.  Maximum group sizes for commercial motor excursions were also reduced from 43 to 32.  *Id*. at 61.  Commercial user days were held essentially level at 115,500, while non-commercial user days were more than doubled to an estimated 113,486.  *Id*. at 60.[13]

In sum, the Park Service's decision concerning the amount of motorized trips on the river was made after considering competing alternatives and a significant number of variables.  The Park Service chose an alternative that reduced motorized uses from current

---

[13]The Park Service considered five alternatives for the Lower Gorge, including a no-action alternative (Alternative 1), but the Lower Gorge issues differed from those in the Lees Ferry Segment.  Plaintiffs have spent little time addressing Lower Gorge issues in this case.  The Lower Gorge management is complicated by the existence of Hualapai tribal lands and Hualapai River Runner day trips.  After undertaking an analysis of five alternatives, the Park Service selected Alternative 4, which eliminated up-river jet boat tours.  FEIS Vol. I at xiii.

1    levels.  The Court is satisfied that the Park Service, as stated in the ROD, determined the

2    "type and level" of traffic on the river that was "necessary and appropriate," including the

3    type and level of motorized uses.  ROD at 6.

4         Plaintiffs argue that even if the Park Service made such a determination, the

5    determination was arbitrary and capricious.  As noted above, however, the decision occurred

6    only after an extensive analysis of various alternatives.  Defendants have identified a number

7    of factors in the Administrative Record that support the Park Service's decision to allow

8    motorized traffic to continue.  First, because motorized trips take less time to complete (10

9    days as opposed to 16 days for non-motorized trips), substantially more people can see the

10   Park each year from the river if motorized trips continue.  FEIS Vol. I at 33-34; Vol. III at

11   87-88, 328-29; AR 066574-80; SAR 015529, 016415.  Second, motorized trips are frequently

12   chartered for special-needs groups, educational classes, family reunions, or to support kayak

13   or other paddle trips.  AR 048368, 048920, 048972-73, 049081, 050205, 050290-92, 050710,

14   051222-27, 054067.  Third, because of their increased mobility, motorized trips help alleviate

15   overcrowding at popular campsites and attractions in the Corridor.  FEIS Vol. I at 33-34;

16   Vol. III at 302; AR 050205.  Fourth, some individuals feel safer when traveling in motorized

17   rafts.  FEIS Vol. III at 312-313.  In addition, studies performed as part of the DEIS found that

18   visitors are able to experience the river as wilderness in the presence of motorized uses and

19   that those who took motorized trips were significantly more likely to stress safety and trip

20   length as the most important factors in the choosing the type of trip they took.  SAR 015427-

21   29.

22        Given the "judicial presumption favoring the validity of administrative actions" and

23   the "administrative discretion" granted the Park Service under the Concessions Act, *Kleppe*,

24   608 F.2d at 1254, the Court cannot conclude that the agency acted arbitrarily and

25   capriciously when it found that the Modified Alternative H levels of motorized uses were

26   "necessary and appropriate for public use and enjoyment" of the Colorado River Corridor.

27   16 U.S.C. § 5951(b).  The question is not whether this Court agrees with the Park Service's

28   decision, but whether it is reasonably supported by the Administrative Record.  In light of

1   the DEIS and FEIS analysis outlined above, the Court finds that it is.

2        Plaintiffs spend little time addressing the other policy statement of the Concessions

3   Act – that the necessary and appropriate public uses should be "consistent to the highest

4   practicable degree with the preservation and conservation of the resources and values of the

5   unit." 16 U.S.C. § 5951(b).  Read in isolation, this policy could eliminate all public uses of

6   the Colorado River Corridor, motorized and non-motorized, because preservation of the

7   natural resources of the Corridor would be accomplished to the "highest practicable degree"

8   by eliminating all human interference.  This is not what Congress intended.  The Concessions

9   Act, after all, authorizes the Park Service to permit commercial concessions in national parks.

10   Rather, this policy must be achieved in light of  the policy's preceding requirement – that

11   uses are limited to those necessary and appropriate for public use of the parks.  Once those

12   necessary uses are identified, they must be managed to the highest practicable degree to

13   preserve the resources and values of the Park.

14        The Court is satisfied that the Park Service did not act arbitrarily and capriciously

15   when it concluded that Modified Alternative H was consistent to the highest practicable

16   degree with preserving the resources and values of the Corridor.  As noted above, the DEIS

17   and FEIS evaluated Modified Alternative H and other alternatives against a large number of

18   environmental factors.  With the exception of the effects of motors on the soundscape of the

19   Park, Plaintiffs do not challenge this evaluation.  With respect to the effects on soundscape,

20   the Court finds below that the Park Service did not act arbitrarily and capriciously.

21   **V.**     **The Organic Act.**

22        The Organic Act provides that the Park Service "shall promote and regulate the use

23   of . . . national parks . . . in such manner and by such means as will leave them unimpaired

24   for the enjoyment of future generations."  16 U.S.C. § 1.  The Act also provides that "[n]o

25   natural curiosities, wonders, or objects of interest shall be leased, rented, or granted to

26   anyone on such terms as to interfere with free access to them by the public[.]"  16 U.S.C. § 3.

27   Plaintiffs contend that the 2006 CRMP is arbitrary and capricious because it permits

28   commercial boaters to use the river at levels that interfere with free access by the public, and

because it concludes that motorized uses do not impair the natural soundscape of the Park.

A.     Free Access.

Plaintiffs argue that the allocation of river access between commercial and non-commercial users is inequitable and thus limits the free access of members of the public. As noted above, however, the Park Service has significantly increased the access of non-commercial users. The 2006 CRMP allocates 115,500 user days to commercial users and an estimated 113,486 user days to non-commercial users.  *See* FEIS Vol. I at ix.[14]  This is essentially the same allocation commercial users received under the 1989 CRMP, but a substantial increase from the 58,048 user days that non-commercial boaters received under the 1989 plan.  Stated in different terms, the allocation of river time between commercial and non-commercial user days changed from 66.5% commercial and 33.5% non-commercial under the 1989 CRMP, to 50.4% commercial and 49.6% non-commercial under the 2006 CRMP.    The 2006 CRMP also reduced the number of launches and passengers for commercial users while nearly doubling both categories for non-commercial users.  FEIS Vol. I at 45, 60.  It is noteworthy that neither GCROA, which consists of commercial river users, nor GCPBA, which consists of non-commercial users, agree with Plaintiffs.  Both organizations contend that the Park Service's allocation of user days is reasonable.[15]

---

[14] Plaintiffs argue that user days are not a fair measure of use.  While the Park Service has stated that "[d]aily launches are probably the most important use measure for measuring impacts to visitor use and experience," it also has noted that "[t]he daily number of people launching would probably provide similar information[.]"  FEIS Vol. III at 55.  The Court finds that user days – a factor of the number of people that launch and the number of days the trip lasts – is a reasonable basis for analysis.  The Ninth Circuit used the same measure in *Kleppe*.  *See* 608 F.2d 1250.

[15] Plaintiffs complain that a substantial portion of the additional non-commercial days are in the winter, and that the Park Service acted without evidence that boaters would use the river in the winter.  Defendants note that the 2006 CRMP increases non-commercial user days in all seasons of the year.  The FEIS also notes that "there is interest in trips during the winter. . . . [W]inter trips offer greater opportunities for quiet and solitude compared to other times of the year.  The less crowded nature of winter months enhances wildlife viewing and cooler daytime temperatures are conducive to off-river hiking."  FEIS Vol. I at 34 (emphasis omitted).  Ninety percent of available winter dates were used between 1998 and 2002 – 100%

1    Plaintiffs argue that non-commercial users are required to wait for permits to run the

2    river – sometimes for 10 or more years – while clients of commercial rafting companies

3    usually can book a trip within one year.  They also assert that the current allocation favors

4    the wealthy who can afford commercial trips, and they criticize the Park Service for not

5    conducting a demand study that would have revealed the most equitable allocation.  The

6    Court cannot conclude on this basis, however, that the CRMP is arbitrary and capricious.

7    The 2006 CRMP significantly revised the system for private boaters to obtain permits by

8    establishing a lottery system that is weighted to favor those who have not received a permit

9    in previous years.  ROD at 20 (AR 109610).  Moreover, surveys show that 61% of private

10   boaters have floated the Colorado River Corridor before, while only 20% of commercial

11   boaters were on repeat trips.  SAR 015505.  The existence of a waiting list therefore does not

12   necessarily show that more private boaters than commercial customers are awaiting their first

13   river trip.  Finally, experts advised the Park Service that a demand study would cost more

14   than $2 million and likely would be of limited value.  FEIS Vol. III at 177.

15   More generally, Plaintiffs tend to characterize the dispute as one between commercial

16   companies and private citizens.  This is not the true nature of the issue:

17   Throughout these proceedings [plaintiff] has persisted in viewing the dispute
     as one between the recreational users of the river and the commercial
18   operators, whose use is for profit.  It asserts that by giving a firm allocation to
     the commercial operators to the disadvantage of those who wish to run the
19   river on their own the Service is commercializing the park.  [Plaintiff] ignores
     the fact that the commercial operators, as concessioners of the [Park] Service,
20   undertake a public function to provide services that the [Park Service] deems
     desirable for those visiting the area.  The basic face-off is not between the
21   commercial operators and the non-commercial users, but between those who
     can make the run without professional assistance and those who cannot.

22

23   *Kleppe*, 608 F.2d at 1253-54 (internal citations omitted).

24   As noted above, a coalition of commercial and private boater organizations submitted

25   joint comments to the Park Service that supported an equal allocation of river time between

26   _____

27   when they were made available six months in advance.  AR 107920, 109498.  The Court
     concludes that the Park Service had a reasonable basis for concluding that winter trips would
28   be used by non-commercial boaters.

1  commercial and non-commercial users on an annual basis.  AR 060444-51.  These users of

2  the river apparently did not believe that such a system would interfere with free access.[16]

3  **B.    Impairment of the Natural Soundscape.**

4  Plaintiffs make several arguments in support of their claim that the Park Service acted

5  arbitrarily and capriciously when it concluded that motorized uses of the Corridor do not

6  impair the natural soundscape of the Park within the meaning of the Organic Act.  The Court

7  finds these arguments unpersuasive.

8  First, Plaintiffs contend that the Park Service used the wrong baseline – that it

9  compared motor-generated sounds to the noise of the Corridor with aircraft flying overhead,

10  rather than comparing motorized noises to the natural quiet of the Park.  This argument is

11  incorrect.  The Park Service compared periods of noise from river traffic (motorized and non-

12  motorized) to periods when there was no noise.  FEIS Vol. II at 348-87.  The Park Service

13  also evaluated the length of "noise-free intervals" when motorized traffic was in the Park.

14  *See, e.g., id.* at 386.

15  Plaintiffs next contend that the Park Service failed to consider the cumulative effects

16  of noise from river traffic.  This also is incorrect.  After comparing river traffic noise to

_____

18  [16]In support of their argument, Plaintiffs submitted the affidavit of Donald W. Walls.  Dkt.

19  #71-2.  Dr. Walls opines that an equal allocation between commercial and non-commercial boaters cannot be determined to be fair in the absence of a demand study, and that a lottery

20  system that applies to all users would be more fair.  As noted above, however, a panel of experts advised the Park Service in January of 2003 that a demand study was likely to cost

21  $2 million and be of limited use.  FEIS Vol. III at 177.  Dr. Walls does not address this

22  advice and therefore does not provide a basis for concluding that the Park Service acted arbitrarily and capriciously when it decided not to conduct such a study.  Moreover, although

23  Dr. Walls opines that a lottery system would be more fair than the Park Service's equal allocation of days between commercial and non-commercial users, he does not address

24  whether such a system – which would render the yearly demand for commercial services less predictable – would permit the continued operation of commercial river runners that the Park

25  Service has found to be necessary and appropriate.  Nor does Dr. Walls address the fact that

26  a coalition of river users, including commercial and private users, supported the equal allocation adopted by the Park Service, or explain why the Park Service's consideration of

27  such representative support was unreasonable.  Dr. Walls' opinion, although a legitimate

28  point of view, does not persuade the Court that the CRMP is arbitrary and capricious.

1    natural background sounds, and evaluating noise-free intervals, the Park Service considered

2    the cumulative effect of such noise when added to other sounds in the Park such as aircraft

3    overflights.  The Park Service then reached the following conclusion:

> Although Modified Alternative H would contribute to the overall cumulative effects of noise on the park's natural soundscape, even if all noise from all river recreation was eliminated from the park (including river-related helicopter flights at Whitmore), the cumulative effects of aircraft noise would still be adverse, short- to long-term, and major.  There would still be 'significant adverse effects' on the natural soundscape due to frequent, periodic and noticeable noise from overflights, and 'substantial restoration of natural quiet' would not be achieved as required by Public Law 100-91 and other mandates.

9    *Id*. at 387 (emphasis omitted).

10         Plaintiffs contend that this cumulative analysis should have caused the Park Service

11   to eliminate sounds from motorized river traffic.  But if a cumulative analysis were to result

12   in the elimination of all sounds that can be eliminated by the Park Service – in this case, all

13   sounds other than aircraft overflights, which are not within the jurisdiction of the Park

14   Service – then all human activity in the Park would be eliminated.  And still the aircraft

15   overflights would create substantial and adverse sound effects in the Park.  Plaintiffs have

16   articulated no principled basis upon which the Court can conclude that the Park Service

17   should have eliminated motorized noises on the basis of such cumulative analysis, but not

18   other human-caused noises such as hiking or non-motorized raft trips.  The Court cannot

19   conclude that the Park Service acted arbitrarily and capriciously when it concluded from a

20   cumulative-effects analysis that motorized river traffic noise was not the source of serious

21   sound problems in the Park and that elimination of such noise would not significantly

22   improve the overall soundscape.

23         Finally, Plaintiffs argue that the Park Service failed to consider earlier environmental

24   impact statements and a number of studies conducted in the 1970s, some of which found that

25   river use impacted the soundscape within the Park.  The Park Service relied primarily on

26   studies conducted by noise experts in 1993 and 2003.  FEIS Vol. II at 352-53.  These studies

27   included field acoustic measurements, including sounds from motorized and non-motorized

28   raft trips.  The studies determined the distance at which motorized rafts could be heard and

1   the length of time they were audible while traveling down-river, when measured from fixed

2   points in the Park.  *Id.*  The studies also evaluated the effects of other sounds such as water

3   flow, wind, wildlife, human voices, helicopters, and aircraft overflights.  *Id.*  The studies

4   provide a reasonable basis for evaluating sound effects within the Park.

5          Plaintiffs argue that the Park Service failed to consider 28 previous studies, but they

6   identify no specific studies for the Court to consider.  Nor do Plaintiffs cite any recent studies

7   that call into question the findings of the 1993 and 2003 studies.  Defendants also note that

8   any studies conducted in the 1970s would have concerned louder two-stroke engines rather

9   than the quieter and cleaner four-stroke engines now used in the Corridor.  Finally, the 2003

10  study specifically considered and summarized the earlier studies relied on by Plaintiffs.

11         Given all of these considerations, the Court cannot conclude that the Park Service

12  acted arbitrarily and capriciously when it concluded that motorized uses do not impair the

13  soundscape of the Park within the meaning of the Organic Act.

14  **VI.   NEPA.**

15         Plaintiffs claim that the 2006 CRMP is arbitrary and capricious because it failed to

16  comply with NEPA, 42 U.S.C. § 4321 *et seq.*  Specifically, Plaintiffs contend that the Park

17  Service failed to take a "hard look" at cumulative sound impacts and failed to use high

18  quality information or accurate scientific analysis.

19         Under NEPA, federal agencies must prepare detailed environmental impact statements

20  for "major federal actions significantly affecting the quality of the human environment."  42

21  U.S.C. § 4332(2)(c).  "NEPA does not work by mandating that agencies achieve particular

22  substantive environmental results."  *Marsh v. ONRC*, 490 U.S. 360, 371 (1989).  "NEPA's

23  goal is satisfied once . . . information is properly disclosed; thus, NEPA exists to ensure a

24  process, not to ensure any result."  *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*,

25  88 F.3d 754, 758 (9th Cir.1996).

26         Judicial review of an environmental impact statement is "extremely limited."  *Nat'l

27  Parks & Conservation Ass'n v. U.S. Dept. of Transp.*, 222 F.3d 677, 680 (9th Cir. 2000).  A

28  court evaluates such a statement only to determine whether it "contains a reasonably

1  thorough discussion of the significant aspects of the probable environmental consequences"

2  of the challenged action.  *Or. Envtl. Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1987)

3  (internal quotes and citation omitted).  A court "need not fly-speck the document and hold

4  it insufficient on the basis of inconsequential, technical difficulties, but will instead employ

5  a rule of reason."  *Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 343 (9th Cir. 1996) (internal

6  quotes and citation omitted).

7  Plaintiffs  contend that the Park Service failed to take a "hard look" at the cumulative

8  impacts of noise on the Park as required by 40 C.F.R. §§ 1502, 1508.7.  The Court disagrees.

9  As described in the preceding section, the Park Service specifically considered the

10  cumulative effects of noise on the river environment, including noise from river traffic,

11  helicopters, and aircraft overflights.  A cumulative noise analysis was performed for each of

12  the alternatives considered for the Lees Ferry Segment.  FEIS Vol. II at 348-86.  A similar

13  cumulative impact analysis was presented for each of the Lower Gorge alternatives.  FEIS

14  Vol. II at 387-404.  Plaintiffs provide no record citations or analysis for impacts they say

15  should have been considered cumulatively.  The Court concludes that the Park Service took

16  a hard look at the cumulative impacts of noise from river traffic, including motorized traffic.

17  Plaintiffs also contend that the Park Service failed to use high quality information or

18  accurate scientific analysis, but Plaintiffs provide no factual basis for this argument.  As

19  Defendants note, the bibliography for the FEIS includes more than 500 technical and

20  scientific references.  The Court cannot conclude that the Park Service acted arbitrarily and

21  capriciously by failing to consider high quality information or appropriate scientific analyses.

22  **VII.    Conclusion.**

23  Plaintiffs have failed to establish that the Park Service acted arbitrarily and

24  capriciously when it adopted the 2006 CRMP.  The Court accordingly will grant the

25  summary judgment motions of Defendants and Intervenors and deny the summary judgment

26  motion of Plaintiffs.

27  **IT IS ORDERED:**

28  1.      Defendants' motion for summary judgment (Dkt. #64) is **granted**.

2.     Intervenors' cross-motions for summary judgment (Dkt. ##62, 67) are **granted**.

3.     Plaintiffs' motion for summary judgment (Dkt. #55) is **denied**.

4.     Defendants' motion to strike (Dkt. #73) is **denied**.

5.     The Court will enter judgment by separate order.  The Clerk is directed to **terminate** this action.

DATED this 26th day of November, 2007.

_____
David G. Campbell
United States District Judge